# United States District Court
## Western District of Virginia
### Harrisonburg Division

|  |  |
|---|---|
| **HUGH FRANKLIN LAREW,** | Civil No.: 5:13cv00069 |
| *Plaintiff,* |  |
| v. | REPORT AND RECOMMENDATION |
| **CAROLYN W. COLVIN**, Acting Commissioner of the Social Security Administration |  |
|  | By: Hon. James G. Welsh |
| *Defendant* | U. S. Magistrate Judge |

Hugh Franklin Larew brings this civil action (docket #7) challenging a final decision of the Commissioner of the Social Security Administration ("the agency") denying his application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, as amended ("the Act"), 42 U.S.C. §§ 416(i) and 423. Jurisdiction of the court is pursuant to 42 U.S.C. § 405(g).

Along with her Answer (docket #28), the Commissioner filed a certified copy of the Administrative Record ("R.") (docket #29), which includes the evidentiary basis for the findings and conclusions set forth in the Commissioner's final decision.[1] Each party seeks summary judgment (docket #32 and #33) and has filed a supporting memorandum of points and authorities (docket #32, #34 and #35). Oral argument was conducted on October 20, 2014 with plaintiff's attorney and defendant's attorney each appearing telephonically (docket #36). By standing order this case is before the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

---

[1] "[R]edigitized for legibility" and without any motion or further explanation the plaintiff, by counsel, electronically filed as "[a]dditional evidence" copies of "pp. 531-36 of Admin. Record" (docket #31).

## I. ADMINISTRATIVE AND PROCEDURAL HISTORY

In his DIB application filed on January 5, 2011, the plaintiff alleges a disability beginning December 11, 1999 due to "fused left ankle, 4th and 5th lumbar [disc disease], stroke 11-22-10, cannot walk without assistance, feel like I am falling, Lef/hard (sp?) to see depth perception, headaches, high blood pressure, cloffed (sp?) arteries to brain, speech slurred, have to lay down, face goes numb [and] back and spine crushed" (R. 16, 92, 178, 210). [2] His claim was denied initially, on reconsideration, and by the written decision of an administrative law judge ("ALJ") dated July 20, 2012 following an administrative hearing (R.15-20, 27-51, 73-103, 121-124). Although he was fully informed of his right to representation and was granted a multi-month continuance in order to obtain representation (R. 16, 52-58), the plaintiff elected not to be represented by an attorney or a non-attorney representative at the hearing held on June 12, 2012 (R. 16, 27-28).

Based on his "careful consideration of the entire record," in the ALJ's written decision he made the following findings of fact and conclusions of law: (1) the plaintiff last met the insured status requirements for disability purposes under Title II of the Act on December 31, 2002 (R. 17); (2) the plaintiff performed no substantial work activity during the period between his alleged disability onset date in December 1999 and the end of December 2002, his last insured date (R. 17); (3) despite requests to Augusta Medical Center, UVa Hospital and Martha Jefferson Hospital for medical records related to the plaintiff's treatment during the decisionally relevant period (December 1999 through December 2002), none had been received (R. 19); (4) the medical record failed to establish, either from medical consultants or by medical signs and laboratory findings, that the plaintiff suffered from a medically determinable impairment through

---

[2] As of December 6, 2010, the plaintiff was separately determined to be medically disabled within the meaning of the agency's applicable regulations and deemed eligible for supplemental security income ("SSI") as of his filing date due to the late effects of cerebrovascular disease and migraine headaches (R. 15-16, 80-89, 91, 105-120).

2

his last insured date (R. 18-19); (5) the plaintiff failed to meet his burden of establishing the existence of a disabling medical condition during the decisionally relevant period (R. 18-19); and (6) the plaintiff was not under a disability during the decisionally relevant period (R. 19).

Following the ALJ's July 20, 2013 issuance of his adverse hearing decision, the plaintiff filed for Appeals Council review on the basis of "paperwork that was not submitted … do (sp?) to some clerical errors" (R. 11-12). This request for review was subsequently denied by the Appeals Council action on September 25, 2013 (R. 8-10).

Five months later, by newly retained counsel, the plaintiff submitted twelve pages (R. 531-542) of medical records dated between February 24, 1989 and January 19, 2002 along with a reopening request on the basis of "new and material evidence" of a disabling condition during the decisionally relevant period (R. 1-7). The Appeals Council thereafter set aside its earlier action, received and considered the additional information, and on April 17, 2013 denied the request for review (R. 1). Therefore, the unfavorable ALJ decision now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981.

## II. ISSUE PRESENTED ON APPEAL

The plaintiff presents one issue on appeal. It is his contention that the Appeals Council erred by failing to award DIB on the basis of certain additional evidence submitted to, and considered by, it that in his view establishes his disability pursuant to listing § 1.04 prior to the expiration of his insured status on December 31, 2002 (docket # 32, pp 3-6).

## III. SUMMARY RECOMMENDATION

Based on a thorough review of the administrative record, and for the reasons herein set forth, it is **RECOMMENDED** the plaintiff's motion for summary judgment be **DENIED**, the Commissioner's motion for summary judgment be **GRANTED**, final judgment be entered

3

**AFFIRMING** the Commissioner's decision denying benefits, and this matter be **DISMISSED** from the court's active docket.

## IV.  STANDARD OF REVIEW

When reviewing the Commissioner's final decision, a federal court is limited to determining whether the "factual findings of the [Commissioner] . . . are supported by substantial evidence and were reached through application of the correct legal standard." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).  If the factual findings are determined to have the proper support and result from the application of the proper standard, the court must uphold the decision. *Id.*  Substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).  "In reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ]." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (*per curiam*) (quoting *Craig*, 76 F.3d at 589).  Furthermore, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id.* (internal quotation marks omitted).  The court will now address the question of "whether the ALJ's finding of no disability is supported by substantial evidence." *Id.* (citing *Craig*, 76 F.3d at 589).

## V.  THE MEDICAL AND VOCATIONAL RECORD

### *Age, Education and Vocational Experience*

At the time of his alleged disability onset date in December 1999 the plaintiff was forty-three (43) years of age (R. 18, 30, 92).  At this age the plaintiff is classified as a "younger person," and pursuant to the agency's regulations age is generally considered not to affect seriously a younger person's ability to adjust to other work.  20 C.F.R. § 404.1563(c).  He has a

4

high school equivalent education and he is able to read and write (R. 32, 70). His last recorded work before expiration of his insured status was employment as a stone mason during the years 1997-1999 by Stone Mountain Builders (R. 37, 189-190). According to the plaintiff, in 1999 he got to the point that he could not do this work every day due to his ankle and back (R. 37-38).

*Plaintiff's Testimony*

In his hearing testimony the plaintiff stated that in the "last 90s" his "back went" and he developed severe pain (R. 33-34). X-rays' had disclosed a ruptured disc, and in order to continue to work he underwent a series of spinal corticosteroid shots (R. 34). At some point, one of these shots "ruptured [his] spinal cord, causing a cerebrospinal fluid leak fluid, giving him a severe migraine headache, and requiring an epidural blood patch (R. 34-35). Also according to the plaintiff, "around in 2000" he was twice hospitalized for treatment of his back pain with traction and bed rest; pharmacologically only a muscle relaxant was prescribed, and he was taking no pain medication (R. 36-37).

*Relevant Medical Evidence*

As the ALJ correctly noted in his written decision, "the earliest medical evidence" in the record at the time of his decision was an office note of William Toomy, MD, dated March 7, 2007, more than four years after the plaintiff's insured status expired (R. 18, 392). Therein, Dr. Toomy records the plaintiff's complaint of chronic low back pain related to a "fall [in] 1993;" Flexural was prescribed, and no follow-up appointment was scheduled (*Id.*).

Dr. Toomy's more recent office records show that the plaintiff was treated in October for an abscessed tooth and in December 2007 following a cerebellar infarction and multi-day in-patient treatment first at Augusta Health and then at UVa Medical Center (R. 288-325, 331-374, 375-383, 387, 389, 391, 393-411). When Dr. Toomy saw the plaintiff in October and again when he saw the plaintiff in December, he noted that it had been "many years" since the plaintiff

5

had seen a physician "other than for this recent event;" he recorded no complaint or other suggestion of any chronic pain-related condition, and his physical examination and laboratory findings (with the exception of his elevated blood pressure) were generally normal (R. 389, 392, 396-397). As a treatment modality, Dr. Toomy prescribed one aspirin and one cholesterol inhibitor daily. As part of the plaintiff's mid-January 2011 follow-up office visit, Dr. Toomy noted both that the etiology of the November infarction event "was obscure" and that the CT brain scan "showed no high density lesions or hypo-densities," demonstrated "[n]o extra cerebral fluid," and was "negative" (R. 387). On examination, the plaintiff's blood pressure continued to be elevated; his other vital signs continued to be "essentially negative;" by observation he was noted to demonstrate gait instability "probably secondary" to the infarction event, and his pain level was assessed at "Ø out of 5" (R. 387-388, 393-395).

### *Consultive Examination*

On April 11, 2011, the plaintiff was seen by John Scagnelli, MD, for a consultive medical examination. In connection with this examination, the plaintiff gave a medical history that included an L4/L5 disc rupture in 1987, a left ankle injury and subsequent surgical fusion as the result of falling from a roof in 1993, a tennis elbow condition since 1997 secondary to his masonry and carpentry work, a stroke in November 2010 that affects his left side and leg primarily, depression, and chronic pain with "most prolonged" and "repetitive" activities" (R. 413-414). The history given by the plaintiff also identified a cholesterol inhibiter, an anti-anxiety, a "heart medication," and aspirin as his only medications (R. 414).

In his mental health assessment, Dr. Scagnelli recorded the plaintiff's "depressed" mood and a "flat affect;" however, he found the plaintiff to be alert, fully oriented, to exhibit "clear thought processes," a "normal" memory, and "good" concentration (R. 415-416).

6

Physically, the plaintiff exhibited "a careful gait with a fear of falling;" however, he used no assistive device (R. 416). He had "good" hand-eye coordination, symmetric reflexes, no muscle spasms, no joint swelling, tenderness or deformity, no manipulative limitations, an ability to squat and rise "with ease," no difficulty rising from a sitting position without assistance, and an ability to lift and carry light objects (R. 416-417). Additionally, he had no loss of muscle strength except for a decrease in left hip flexion and left ankle dorsiflexion with the application of maximum resistance; he exhibited a full range of motion in all other areas, and he demonstrated an ability to walk on his heels but not his toes (R. 416-417). Other than these identified physical limitations, the results of Dr. Scagnelli's otolaryngologic, pulmonary, cardiac, neurologic, cardiovascular and musculoskeletal assessments, including specifically the plaintiff's range of thoracolubar spine motion (R. 417), were all essentially within normal limits (R. 415-417).

### *State Agency Physician Assessments*

In May and again in September 2011 state agency medical professionals [3] reviewed the medical evidence and assessed of the plaintiff's disability claim (R. 73-79, 92-98). In connection with these reviews, both physicians noted the plaintiff's impairment allegations, his alleged onset date of December 1999, his limited treatment history, the medical evidence of record (including his inpatient treatment for a cerebellar infarction in November 2010 and his December-January follow-up care), his physical and mental limitations associated with the November 2010 event, the results of Dr. Scagnelli's May 2011 consultive examination findings, the plaintiff's various unsuccessful work attempts during the years 2007-2010, and the various other relevant

---

[3] State agency medical and psychological consultants are "highly qualified ... experts in the evaluation of the medical issues in disability claims under the Social Security Act." 20 C.F.R. § 404.1527(e)(2)(i).

vocational factors (*Id.*). On this record each state agency physician concluded that there was no evidence of a disabling condition before the plaintiff's last-insured date (R. 78-79, 97-98).

### *Additional Evidence Submitted to Appeals Council*

Approximately five months after the ALJ had issued his decision and after the Appeals Council had denied the plaintiff's request for review, he submitted several pages of additional medical records. These included six pages of medical records pertaining to his February 24-March 1, 1989 hospitalization by Dr. Toomy for diagnosis and conservative treatment of diffuse back pain the plaintiff associated with injury that had originally occurred in April 1988, "when he picked up a heavy rock" (R. 531-536). On admission, Dr. Toomy's impression was "back pain" due to a probable acute lumbosacral strain (R. 532). Following his admission an X-ray study demonstrated only "mild" osteophyte formation at L5/S1 (R. 533); a lumbosacral CT scan, however, demonstrated a bulging disc at L/4 and "some" osteophyte formation at L/5 (R. 534). The following day, the consulting orthopedist found the plaintiff's acute pain and spasm "had subsided" and he recommended continued "bedrest and conservative care" and consider a discectomy in the event he failed to make satisfactory improvement (R. 535).

As an additional document supporting his claim, the plaintiff submitted a one-page report of an MRI study dated December 26, 2000, some eleven years later, and five pages of medical records from Augusta Medical Center ("ANC") dated January 9-10, 2002, after the passage of two additional years (R. 538-542). In a nutshell, the MRI report demonstrates at most a somewhat more pronounced degenerative disc condition after the passage of eleven years, which was at the time causing back pain and an attendant radiculopathy (R. 537). The AMC records, to the limited extent they are legible, suggest the 2000 flare-up "subsided," that he experienced another flare-up of acute back pain one year later after he had been lifting heavy barn doors, and

8

that he had been discharged after a physical therapy session and being given prescriptions for Motrin and Flexeril (R. 538-541).

## VI. DISCUSSION

On appeal to this court, the plaintiff contends that the Appeals Council failed to evaluate his back condition under Listing 1.04 (docket #32, pp 4-6). In contrast, the Commissioner counters that the documents submitted to the Appeals Council by the plaintiff were considered, but they fail to constitute substantial evidence of a § 1.04 listing-level impairment, and the plaintiff has, therefore, failed to carry his burden to show that his back condition was of disabling severity during the decisionally relevant period (docket #34, pp 9-13).

To demonstrate a listing-level disability the plaintiff is obligated to present evidence either that his impairment meets or that it is "medically equivalent" to a listed impairment. *See Kellough v. Heckler*, 785 F.2d 1147, 1152 (4th Cir. 1986); *see also* 20 C.F.R. § 404.1526 medical equivalence regulation). Accordingly, the plaintiff's bears the responsibility of producing evidence to demonstrate that his back condition meets all of the elements of the listed impairment upon which he seeks to rely. *See Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria, [and a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify.").

> Listing 1.04(A) requires proof of a spinal disorder "(*e.g.*, herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture) resulting in compromise of a nerve root (including the cauda equine) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or

9

Case 5:13-cv-00069-MFU-JGW   Document 40   Filed 10/29/14   Page 9 of 14   Pageid#: 720

reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]" [4]

20 C.F.R. pt. 404, subpt. P., appx. 1, § 1.04.

At best, the plaintiff's additional evidence demonstrates that he had the ability to function in the work place for at least thirteen years after a 1989 herniated nucleus pulposus diagnosis. None of the plaintiff's three documented back pain flare-up events (1989, 2000 and January 2002) persisted; each was treated conservatively, and on only one occasion was it reported that the plaintiff experienced a neuro-anatomic radiculopathy. Other than an orthopedic consultation in 1989, the plaintiff was never referred to a neurologist, a neurosurgeon, pain management, or other specialist. Furthermore, during the decisionally relevant years, and since, there is nothing in the record to suggest, let alone minimally demonstrate, any limitation of spinal motion, sensory or reflex loss, motor loss, muscle weakness, muscle atrophy, positive straight-leg raising test, or other condition that would impose non-exertional occupational limitations during the decisionally relevant period. *See* 20 C.F.R. pt. 404, subpt. P, appx. 1, § 1.04(A). Although the medical records submitted by the plaintiff to the Appeals Council demonstrate a § 1.04(A) spinal disorder during the relevant period, his evidence fails to establish the requisite co-occurring loss of function.

This lack of essential proof is in effect tacitly conceded by the core argument advanced by the plaintiff in his brief. Lacking any clinical or other objective evidence of a loss of motor function, he seeks to premise the severity of his symptoms on a single entry in a single hospital record (docket #32, p 5 (citing R. 541)). Following an over-night hospitalization for bed rest and conservative treatment for an acute onset of sciatic pain radiating into the right lower extremity "after lifting some heavy barn doors," Dr. Carrington Harrison's discharge summary dated

---

[4] The plaintiff neither alleges nor argues that his back condition satisfies either the listing 1.04(B) or the 1.04(C) criteria relating to spinal arachnoiditis or lumbar spinal stenosis resulting in pseudo-claudication.

10

January 10, 2002 recorded the plaintiff's self-report of "some degree of difficulty with function at work" (R. 541). Reliance of this single the entry in the record is scant evidence to support the long-standing functional limitations claimed by the plaintiff due to disabling pain and discomfort. Moreover, this self-reported symptom does not rise to the level of a wholly disabling condition. As the Fourth Circuit has held, even a treating physician's opinion based on self-reported symptoms is a legitimate ground to reject it. *See generally Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), and it is equally a cognizable basis to reject both the plaintiff's self-reported statement and the inference he seeks to draw as not based on substantial evidence and unsupported by any clinical or other objective evidence.

Equally misplaced is his reliance on a single characterization of his low back condition as "lumbalgia" (or lumbago) (docket #32, p 5). The term is no more than a non-specific, non-medical, descriptor,[5] and it is patently far too ill-defined to constitute decisionally significant, let alone, substantial evidence of disabling functional limitations associated with the plaintiff's low back condition. It suggests no medically significant reduction in the plaintiff's normal range of spinal function; it suggests no inability to perform fine and gross movements effectively; it suggests no inability to perform activities of daily living, and it suggests no inability to perform the activities listed as examples listing §§ 1.00B2b(2) and 1.00B2c.

In his brief, the plaintiff additionally fails to explain, or even to suggest, a medical basis for his contention that his disc disease of the lumbar spine met or equaled listing 1.04 during the decisionally relevant period, but dramatically improved over the ensuing decade to the degree that the results of Dr. Scagnelli's detailed consultive examination disclosed no disabling musculoskeletal condition in April 2011. His examination results are uncontradicted. In direct

---

[5] "Lumbago is low back pain," *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 849 n.2 (6th Cir. 2010); Dorland's Illustrated Medical Dictionary, 1076 (32nd ed. 2012), defines it as "a nonmedical term for any pain in the lower back."

contradiction of the plaintiff's disability claim, Dr. Scagnelli's findings include *inter alia* a negative straight-leg raising test bilaterally, the ability to squat and rise "with ease," and a range of low back and lower extremity motion that was "within normal limits."

## VII. PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis and on the basis of a careful examination of the full administrative record, the undersigned submits the following formal findings, conclusions, and recommendations:

1. The factual findings of the Commissioner are supported by substantial evidence;

2. The factual findings of the Commissioner were reached through application of the correct legal standards;

3. During the decisionally relevant period, the plaintiff's had the following severe impairments: degenerative disc disease;

4. The plaintiff's insured status expired on December 31, 2002;

5. The plaintiff does not have an impairment, or combination of impairments, that meets or medically equals one of the listed impairments in 20 CFR pt. 404, subpt. P, appx. 1;

6. Pursuant to the plaintiff's March 13, 2013 request, the Appeals Council set aside its September 15, 3012 denial of his request for review in order to consider additional information;

7. The Appeals Council received, filed, and considered the plaintiff-submitted 12-pages of medical records variously dated between February 24, 1989 and January 10, 2002;

8. After considering the additional evidence, the Appeals Council under its rules found no reason to review the ALJ's decision;

9. The decision of the Appeals Council is supported by substantial evidence;

10. Substantial evidence does not support the plaintiff's contention that the 12-pages of medical records demonstrate a musculoskeletal condition of listing-level severity prior to the expiration of his insured status;

11. The consultive examination report of Dr. Scagnelli does not contain medical signs or medically acceptable clinical and laboratory diagnostic techniques necessary to

12

Case 5:13-cv-00069-MFU-JGW   Document 40   Filed 10/29/14   Page 12 of 14   Pageid#: 723

support the existence of a musculoskeletal condition of listing-level severity prior to the expiration of the plaintiff's insured status;

12. The 12-pages of additional medical records received and considered by the Appeals Council do not contain medical signs or medically acceptable clinical and laboratory diagnostic techniques necessary to support the existence of a musculoskeletal condition of listing-level severity prior to the expiration of the plaintiff's insured status;

13. There is no reason to believe that a remand of this case might lead to a different result, *See generally Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a [Social Security] case in quest of a perfect opinion [from an ALJ] unless there is reason to believe that the remand might lead to a different result.");

14. The ALJ and the Appeals Council considered plaintiff's low back condition under Listing 1.04, and any error in doing so is harmless;

15. The plaintiff has not met his burden of proving a disabling condition on or before his date last insured; and

16. The final decision of the Commissioner should be affirmed.

## VIII. TRANSMITTAL OF THE RECORD

The clerk is directed to transmit the record in this case immediately to the presiding United States district judge and to transmit a copy of this Report and Recommendation to all counsel of record.

## IX. NOTICE TO THE PARTIES

Both sides are reminded that, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, they are entitled to note objections, if any they may have, to this Report and Recommendation within fourteen (14) days hereof. **Any adjudication of fact or conclusion of law rendered herein by the undersigned to which an objection is not specifically made within the period prescribed by law may become conclusive upon the parties.** Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitals or findings as well as

to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objections.

**DATED**: This 29th day of October 2014.

*s/ James G. Welsh*
United States Magistrate Judge